# Pike v. Pike.

*Bill in Equity to vacate a Deed.*

1. *Deed; insanity of grantor; burden of proof.*—On a bill filed to vacate and annul a deed on the ground of the grantor's insanity, the presumption is of sanity on the part of the grantor, and the burden of proving insanity rests upon the party alleging it; but if insanity, not connected with or traceable to a cause temporary in its nature—general or confirmed insanity—be shown, the order of proof and presumption is inverted, and the presumption is of the continuance of such insanity, and the burden of removing the presumption devolves on the party affirming the validity of the act done after the time such insanity is shown to have existed.

2. *Same; same.*—Where the validity of a deed is attacked on the ground of the insanity of the grantor, and general and confirmed insanity of the grantor is shown before its execution, the burden is upon the grantee, or those claiming under him, to show that at the time of the conveyance there was, in the mind of the grantor, a lucid interval, and to meet this burden there must be clear, convincing evidence of the intermission of the insanity, and that the act proceeded from the unaided volition of the grantor.

3. *Same; same; insufficiency of evidence.*—Where a bill is filed to cancel a deed on the ground of the insanity of the grantor, and it is shown that before the execution of said deed the grantor was inflicted with general and confirmed insanity, and the deed is sought to be upheld as having been executed in an intermission of the derangement of the grantor, the evidence to support this contention must be addressed to the time of the execution of the conveyance; and evidence merely that, subsequent to the existence of the insanity, but prior to the execution of the deed, the grantor was sane or had intermissions of his insanity, is unavailing and can not be made the basis of an inference or presumption that the grantor was sane at the time of the execution of the conveyance, and is insufficient to uphold the deed.

4. *Same; same; when deed declared void.*—On a bill to vacate a deed as being void on the ground of the insanity of the grantor, it was shown that he was suffering from general and confirmed insanity, that upon the deed, which was already prepared, being handed to him, he executed it without making any inquiry, the execution being listless, indifferent and merely perfunctory, that the deed was the conveyance of all of the land of the grantor, that there was no reason shown inducing the grantor to make the conveyance, that there was no necessity for such sale, that there was the execution of no note or bond for the payment of the unpaid purchase money to protect the grantor

against the recitals of its payment in the deed, and that the consid-
eration, as expressed in the deed, was for one-half of the value of the
property. *Held:* such a transaction is not, in its nature and character,
rational and in accordance with the conduct of men of ordinary pru-
dence and intelligence, similarly situated with the grantor, and is,
itself, a disproof of the existence of a lucid interval on the part of the
grantor at the time of the execution of the deed.

APPEAL from the Chancery Court of Walker.

Heard before the Hon. THOMAS COBBS.

The bill in this case was filed on March 9, 1892, by
James L. Pike and others, children of Reuben A. Pike,
deceased, against Joseph C. Pike, and prayed the can-
cellation of a deed to certain lands, executed on Decem-
ber 17, 1879, by Reuben A. Pike to Joseph C. Pike, on
the ground that the grantor in said deed was, at the
time of the execution thereof, insane, and on the further
ground of undue influence, and the want of consideration
for said deed. The material facts of the case are suffi-
ciently stated in the opinion.

On the final hearing of the cause, on the pleadings and
proof, the chancellor rendered a decree denying the relief
prayed for and dismissing the bill. The defendants
appeal, and assign this decree as error.

APPLING, McGUIRE & COLLIER, for appellants.—1. A
deed made by a party of insane mind to such a degree
as to incapacitate him for making contracts is void, and
his heirs may file his bill in chancery to set it aside.
*Kennedy v. Marrast*, 46 Ala. 161; *Burke v. Taylor*, 94 Ala.
530; Story's Eq., §§ 222, 230.

2. Want of rational and deliberate consent is a suffi-
cient degree of insanity to avoid a contract.—Story's Eq.,
§ 223. As a general rule, insane persons are incapable
of entering into valid contracts, and any agreements
which they may make are either void or voidable.—*Seaver
v. Phelps*, 11 Pick. 304.

3. The chancellor's decree is opposed to the evidence
on which it is based, or is wrong, or he, in rendering it,
"is in manifest error." For, when the existence of lunacy
is once established, it devolves on the opposite party to
prove by testimony equally convincing, that the contract
was made during a lucid interval.—2 Chitty's Eq., 1390,
§ 12; *Rawdon v. Rawdon*, 28 Ala. 565; *Saxon v. Whitaker*,
30 Ala. 237.

[Pike v. Pike.]

4. It was not necessary that complainants restore the consideration in order to avoid said deed.—Tiedeman on Real Prop., 792; 1 Brick. Dig. 690, § 733; *Martin v. Martin*, 35 Ala. 560; *Eureka Co. v. Edwards*, 71 Ala. 248; 5 Amer. & Eng. Encyc. of Law, 427.

COLEMAN & SOWELL, *contra.*—1. In order to constitute incapacity to contract there must be unsoundness of mind, and not mere mental weakness.—*In re Carmichael*, 36 Ala. 514; *Rawdon v. Rawdon*, 28 Ala. 565; *Stubbs v. Houston*, 33 Ala. 555; *Hale v. Brown*, 11 Ala. 87.

2. Where there is mind and memory enough to understand the business in hand, there is sufficient mental capacity to contract.—*O'Donnell v Rodiger*, 76 Ala. 222; *Stubbs v. Houston*, 33 Ala. 555; *Taylor v. Kelly*, 31 Ala. 59; *McElroy v. McElroy*, 5 Ala. 81; Bishop on Contracts, § 962; Chitty on Contracts, (9th Amer. Ed.), 130; 11 Amer. & Eng. Encyc. of Law, 132.

3. The deed of an insane person is not void but voidable only.—Bishop on Contracts, 972-73; 2 Kent Commentaries, (7th Ed.), 562; 11 Amer. & Eng. Encyc. of Law, 146, note. And even though the deed of an insane person might be set aside under some circumstances, it can not be done so at the instance of the heirs until they have restored what money was paid or expended for their benefit.—*Kennedy v. Marrast*, 46 Ala. 161; *Woodstock Iron Co. v. Fullenwider*, 87 Ala. 584; *Bland v. Bowie*, 53 Ala. 152; *Bell v. Craig*, 52 Ala. 215; *Robertson v. Bradford*, 73 Ala. 116.

4. But if the testimony fails to reasonably satisfy that the deed of R. A. Pike to J. C. Pike was executed during a lucid interval, even then these complainants are not entitled to relief until they do equity. A part of the purchase money for these lands has been expended for the support and maintenance of these complainants. J. C. Pike testified that he paid a part of the purchase money for these lands to the guardian of complainants, and the guardian testifies that he has used it for their benefit. Equity and good conscience require that they should pay this money back.—*Kennedy v. Marrast*, 46 Ala. 161; *Woodstock Iron Co. v. Fullenwider*, 87 Ala. 584; *Bland v. Bowie*, 53 Ala. 152; *Bell v. Craig*, 52 Ala. 215; *Robertson v. Bradford*, 73 Ala. 116.

BRICKELL, C. J.—The original bill filed by the appellants, the children and heirs-at-law of Reuben A. Pike, deceased, prays the vacation of a deed conveying lands, which he in his life time had executed to his brother, Joseph C. Pike, the appellee. The deed, as produced and exhibited by the appellee, is an ordinary deed of bargain and sale, bearing date December 17th, 1879, reciting as its consideration two hundred dollars paid to the grantor, the receipt of which is acknowledged, and conveys a tract of land containing one hundred and sixty acres, described according to the Governmental surveys. It purports on the day of its date to have been acknowledged before a justice of the peace, who appends a formal certificate of acknowledgment, and also bears the attestation of a subscribing witness.

The material allegations of the bill are, that at the execution of the conveyance, the grantor was insane, having become so some time prior thereto, and had been confined in the State Insane Asylum, from which he escaped. Subsequently, he was again confined in the asylum, and that his insanity was continuous until his death.

The answer of the appellee denies that the grantor was ever legally declared insane, but admits that he was twice confined in the asylum, and avers that he was discharged therefrom as cured. Avers that he was sane at the execution of the conveyance, affirms that he then had full capacity of contracting, the fairness of the transaction, and the adequacy of the consideration for the conveyance. There was much evidence taken by the parties, and on final hearing, on the pleadings and on the evidence, the chancellor rendered a decree dismissing the bill, from which the appeal is taken.

The general proposition on which the bill is founded, that a court of equity, at the instance of the heirs of an insane grantor, will intervene and vacate a deed conveying lands, which he may have executed while the insanity was existing, has not been controverted. In such controversy, the general rule prevails, that the presumption is of sanity, and the burthen of proving insanity rests upon the party alleging it. But if insanity not connected with or traceable to a cause in its nature temporary; general or confirmed insanity be shown; the presumption is of its continuance, and the burthen of

removing the presumption devolves on the party affirming the validity of an act done after the time the insanity is shown to have existed.—*Johnson v. Armstrong*, 97 Ala. 731; *O'Donnell v. Rodiger*, 76 Ala. 222; *Saxon v. Whitaker*, 30 Ala. 237; *Rawdon v. Rawdon*, 28 Ala. 565; *Attorney General v. Parnther*, 3 Brown Ch. 441; *Smith v. Tebbitt*, 1 L. R. (P. & D.) 354; *Hix v. Whittemore*, 4 Metc. 545; *Clark v. Fisher*, 1 Paige, 171; *Harden v. Hays*, 9 Penn. St. 151; *Turner v. Rusk*, 53 Md. 65.

The fact is fully proved, if not undisputed, that prior to the execution of the conveyance, the grantor was insane. The insanity did not originate from, nor was it connected with or traceable to any temporary cause. He had not suffered from any violent disease; nor had he been the victim of any bodily injury; nor had he "fallen into some frenzy, upon some accidental cause, which was afterwards taken away." The first manifestation of the malady was early in the year 1875, when changes in his conduct attracted the observation of his wife. Soon he was tortured day and night by the apprehension that unknown persons were watching for an opportunity to take his life. The apprehension, unreal and unreasoning, intensified, until he was possessed with the belief, because his wife did not share in it, that she was in league with these persons, and he attempted to take her life. Eventually, he became so violent and uncontrolable, that the safety of his family and relatives was endangered, and by proceedings before the judge of the court of probate of the county of his residence, they procured his admission to the Insane Asylum, as an indigent patient. He remained in the asylum about six months, when he returned to his home. Whether he was discharged, or escaped from the Asylum, is a matter of doubt. Soon after his return from the asylum, a separation from his wife occurred, because of her apprehension of her personal safety; and thereafter until his confinement in the asylum the second time, in June, 1882, he resided mostly with his father and mother, the object of their care, solicitude and watchfulness. The second time he remained in the asylum two years or more, until the death of his father, when the appellee went for him, and he came to the home of his mother, where he resided, suffering from bodily disease, lingering in a condition of languor, until his death some two

[Pike v. Pike.]

or three years thereafter. His occupation, that which
he had pursued from his early days, was farming, but
after 1876, he does not seem to have engaged in it, or in
any other business. These are the salient facts, as we
have, after a patient and careful examination, collected
them from the evidence found in the record, considering
only that which is free from all just exception; which
is undeniably competent and admissible. Each case of
this character depends upon its own facts and circum-
stances. An analysis of the evidence, pointing out the
testimony of the several witnesses, their relation to the
parties and to the matter of controversy, the varying
degree of intelligence they may have manifested, and
their respective opportunities of observation and of ac-
quiring knowledge of the facts to which they testify,
would be of but little, if any value in similar cases, and
would unduly and unnecessarily prolong the opinion.

General, confirmed derangement being shown, the
effect is to invert the order of proof and presumption.
The burthen is cast upon the appellee, to show that at
the execution of the conveyance, there was, as it is
termed, a lucid interval, an intermission of the derange-
ment, a restoration of the grantor to his faculties, ena-
bling him to comprehend intelligently, the nature and
character of the transaction in which he was engaged.
The evidence must be addressed to the time of the exe-
cution of the conveyance. Evidence that prior thereto,
at times subsequent to the existence of the general de-
rangement, (if such evidence may be fairly collected
from the record), the grantor was sane, or had inter-
missions of the derangement, is unavailing, and can not
be made the basis of an inference or presumption that he
was sane at the execution of the conveyance.—1 Whart.
& Stille Medical Jurisprudence, sections 61–62; *Saxon
v. Whitaker*, 30 Ala. 237. A lucid interval is in its nature
temporary, and uncertain in its duration, and there can
be no legal presumption of its continuance for a month,
a day, or an hour.—*Saxon v. Whitaker*, 30 Ala. 237,
*supra*.

The protection of the insane, requires that the evi-
dence adduced in support of a lucid interval be examined
with jealous scrutiny; otherwise, fraud and imposition
will be practiced upon them with impunity. In *Attorney
General v. Parnther*, 3 Brown Ch. 444, *supra*, it was said

by the Lord Chancellor, "that the evidence in support of the allegation of a lucid interval, after derangement at any period has been established, should be as strong and as demonstrable of such fact, as when the object of the proof is to establish derangement." And it may be deduced as a general rule from all the authorities, that while acts done in a lucid interval are to be esteemed valid, and will not be defeated by any overstrained demand of proof, there must be clear, convincing evidence . of the intermission of the insanity, and that the act proceeded from the unaided volition of the party.

There are three witnesses produced by the appellee to show the mental condition of the grantor at the time of the execution of the conveyance. The first is the mother of the grantor, with whom he was residing, and in whose house the conveyance was executed. It is uncertain whether her evidence refers to this conveyance, or to another which was executed, (or she supposed was executed), to the appellee and his father. And the evidence is not confined to the time of execution, but is expressed in the general words : "About the time Andy Pike made the deed"; and "so far as I know Andy Pike's mind was right as it had been all along at the time he made said deed to my husband and Jos. Pike". The fact is not a matter of dispute, that the mind of the grantor had not "been right all along;" and the contention in support of the conveyance rests exclusively on the proposition that at the time of its execution, there was a lucid interval; a restoration to sanity. The appellee, and the justice of the peace who prepared the conveyance, taking and certifying the acknowledgment of execution, concur in affirming the sanity of the grantor at the time of execution. We may concede all that can be claimed, that their relationship to him, their long and familiar intercourse with him, their opportunities of observing his general conduct, manner and appearance, and the intelligence they manifest, entitle their evidence to much of consideration. Between this evidence, and the evidence of Bennett, whose attestation as a subscribing witness the conveyance purports to bear, and that of his wife and others, relatives of the grantor and of the grantee, having equal opportunity of observation, and of acquiring knowledge of the facts to which they testify, and manifesting equal intelligence, there is a direct conflict.

The manner of performing the act, the circumstances attending its performance, and whether the act in itself is rational or irrational, in accordance with the conduct of men of ordinary prudence and intelligence, similarly situated with the party to be affected, afford strong evidence of the presence or absence of a lucid interval. The justice of the peace states that he prepared the conveyance. Whether it was prepared before or after reaching the place of execution is not distinctly stated. The conveyance was handed the grantor to be signed, and the words of the justice are : "He took it and looked at it, but I do not know whether he read it or not." The grantor signed, and made acknowledgment of execution, without inquiring, and without, so far as appears, the utterance of a word, unless it be inferred from the certificate of acknowledgment that he admitted the fact of execution. The execution was listless, indifferent, merely perfunctory, to say the least. True, the justice states that subsequently, the grantor talked with him about the deed ; said the grantee owed him the purchase money, and when it was paid, he would pay a debt he owed him. The recollection of the transaction does not lessen the significance of the manner in which the execution of the conveyance was performed. The conveyance recites the payment of the purchase money of the lands : the fact is undisputed, that it was not paid contemporaneously with the execution of the conveyance ; and as we will see hereafter, the contention now is, that it was paid near eight years thereafter, without interest, after the death of the grantor, to the guardian of his minor children. No note or bond, or other evidence of the existence of the debt for the purchase money was taken. No declaration or admission that it was unpaid, and no promise to pay it was made in the presence of the justice, who seems to have been the only person present, besides the grantor and the grantee, at the time the conveyance was executed. The conveyance purports to bear the attestation of Bennett as a subscribing witness. He denies the genuineness of the signature; the grantee states that he did subscribe as a witness at the request of the justice; but the justice was not examined in corrobortion of the evidence of the grantee.

We pass from an examination of the manner in which the conveyance was executed, and the circumstances at-

tending execution, to an inquiry into the transaction. The observation of Sir William Wynne in *Cartwright v. Cartwright*, 1 Phill. 90, has been often quoted: "The strongest and best proof that can arise as to a lucid interval is that which arises from the act itself; that I look upon as the first thing to be examined, and if it can be proved and established that it is a rational act rationally done the whole case is proved." Without adopting this view in its entirety, as we have said, the nature and character of the act, whether in itself it is rational, or irrational, in accordance with the conduct of men of ordinary prudence and intelligence, is strong evidence of the presence or absence of a lucid interval. First, we may observe that no reason is shown inducing the grantor to the sale and conveyance. All his other lands had been sold by the sheriff under execution to satisfy a judgment his father had obtained against him during his derangement, the father becoming the purchaser and subsequently re-selling to the appellee. Whether the grantor had or had not knowledge of these facts, is not known. These lands were his homestead, having upon them all the improvements which had ever been made upon the entire tract or body of lands, and were all the property remaining to him. All necessity for the sale is disproved, if it be true as is now asserted by the appellee, that he did not during his life collect the purchase money, and that for near eight years it remained unpaid, when after his death, it was paid to the guardian of his infant children. The deed recites as its consideration two hundred dollars. The appellee now states that he believes the purchase money was two hundred and fifty dollars, but offers no explanation for the variance between his present belief or recollection and the recital of the deed. If it were material, there could be no hesitancy in accepting as true the recital of the deed, rather than the present belief or recollection of the appellee. As is to be expected, there is much diversity of opinion among the witnesses as to the value of the lands. We think it may be said safely, the weight of the evidence is, that they were of not less value than five hundred dollars. We have then a sale and conveyance of lands made by a grantor of general, confirmed derangement, forming all the property he then owned, for an unexplained reason, or without reason, without necesssity, for half, or less than half

their value. No note, or bond, or memorandum is taken for the payment of the purchase money, protecting the grantor against the recital of its payment in the conveyance. The transaction itself is not in accordance with the conduct of men of ordinary prudence and intelligence, and is in disproof of a lucid interval at the time of its occurrence.

The appellee purchased of the father the lands which he had purchased at the sale by the sheriff, and states that there was a balance of the purchase money remaining after satisfying the execution, which he promised to pay the ancestor of the appellants. So far as is shown he never informed the ancestor of the fact—never made any offer of payment to him—waited in silence, until his death and then paid it to the guardian of his infant children. We cannot ascertain from the evidence what was the amount of this balance. The two payments which he now insists he made aggregate five hundred 67-100 dollars, and we incline to the opinion that the amount of the balance due the ancestor from the sale made by the sheriff was five hundred dollars. However this may be, it is not shown affirmatively and satisfactorily that the purchase money, the consideration of the conveyance, was paid to the guardian, or paid for the use of the grantor. It is not necessary, therefore, to consider when a court of equity, as a condition upon which an executed contract of a person insane will be vacated, may require a restoration of whatever such insane person may have received as the consideration of such contract.

We are satisfied that at the execution of this conveyance the grantor was not capable of executing a valid deed, or making a valid contract. The presence of a lucid interval is far from being shown by that measure of proof which the law demands; and demands upon the highest considerations of right, of reason and of policy, if the transaction itself were beclouded with fewer suspicious circumstances.

The decree of the chancellor must be reversed, and a decree entered granting the appellants the appropriate relief.

Reversed and rendered.